**No. 25-8085 (Lead)**
**No. 26-4919**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

**Cher**

Plaintiff and Appellee

**Mary Bono**

Defendant and Appellant

On Appeal from the United States District Court
for the Central District of California
No. 2:21-CV-08157 JAK (RAOx)
Hon. John A. Kronstadt

---

# APPELLANT'S OPENING BRIEF

---

**DONAHUE FITZGERALD LLP**
Attorneys at Law
Daniel J. Schacht
dschacht@donahue.com
Andrew S. MacKay
amackay@donahue.com
Hayley M. Lenahan
hlenahan@donahue.com
Padmini Cheruvu
pcheruvu@donahue.com
1999 Harrison Street, 26th Floor
Oakland, California 94612-3520
(510) 451-3300

Attorneys for Appellant MARY BONO

# TABLE OF CONTENTS

**Page**


INTRODUCTION ... 1

STATEMENT OF JURISDICTION ... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ... 2

PERTINENT LEGAL PROVISIONS ... 2

STATEMENT OF THE CASE ... 2

I. Factual Background ... 2

A. During Sonny's Lifetime ... 2

B. Sonny's Death and His Heirs ... 4

1. The Termination Notice ... 5

2. The Royalty Administrator ... 5

II. Procedural History ... 6

SUMMARY OF ARGUMENT ... 8

ARGUMENT ... 8

I. Standard of Review ... 8

II. The District Court Failed to Apply Section 304 ... 9

A. The Relevant History of the Copyright Terminations ... 9

1. The Copyright Act of 1909 ... 9

2. The Copyright Act of 1976 ... 10

(1) A New and Unencumbered Property Right ... 11

(2) The Beneficiaries Are the Statutory Heirs ... 13

B. How the District Court Should Have Applied Section 304 ... 13

1. Section 304(c)(5): The MSA Does Not Encumber the Heirs' Termination Rights ... 13

2. Section 304(c)(6)(B)-(D): The Rights Vested in the Heirs Well After Sonny's Death ... 15

(1) All Rights Revert under Section 304(c)(6) ... 16

(2) Section 304(c)(6)(E) Must Be Read as a Whole ... 17

3. Section 304(c)(6)(A) Further Supports Mary's Position ..... 18

C. Where the District Court Erred ..... 19

1. The MSA Could Not Alienate the Heirs' Termination Rights ..... 19

2. The Heirs Are Bound to the MSA Only to the Extent of Sonny's Rights ..... 20

3. Royalties Are Rights that Revert to the Heirs ..... 21

4. The Statutory Heirs Are Sonny's Children and Widow ..... 23

(1) State Family Law and Contract Law Cannot Preempt Copyright Termination Provisions ..... 23

(2) The Statutory Heirs, Not an Ex-Wife, Are the Beneficiaries of Section 304 ..... 26

5. The District Court's Ruling Creates Chaos Regarding Ownership Interests of Heirs ..... 26

III. What Actually Reverted to the Bono Heirs? Two Approaches ..... 27

A. The Heirs Are Entitled to All of the Rights of Copyright ..... 27

B. In the Alternative, The Grant Reverts ..... 28

IV. The District Court Added Non-Existing Restrictions to the Heirs' Ability to Choose a Royalty Administrator ..... 30

V. Conclusion ..... 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berry v. Berry*,
277 P.3d 968 (Haw. 2012) ........................................................................25

*BMG Rts. Mgmt. v. Vetter*,
No. 25-1391, 2026 WL 3116604 (U.S. Oct. 19, 2026) ........................................5

*Bourne Co. v. MPL Commc'ns, Inc.*,
675 F. Supp. 859 (S.D.N.Y. 1987), *modified*, 678 F. Supp. 70
(S.D.N.Y. 1988) ........................................................................................21

*Brown-Thomas v. Hynie*,
Case No. 2:18-cv-00307-SVW-JPR, 2018 WL 3811353 (C.D. Cal.
Aug. 7, 2018) ............................................................................................24

*Chae v. SLM Corp.*,
593 F.3d 936 (9th Cir. 2010) .....................................................................23

*Classic Media, Inc. v. Mewborn*,
532 F.3d 978 (9th Cir. 2008) .................................... 5, 11, 12, 14, 17, 21, 23, 29

*Corcovado Music Corp. v. Hollis Music, Inc.*,
981 F.2d 679 (2d Cir. 1993) ......................................................................14

*Milne ex rel. Coyne v. Stephen Slesinger, Inc.*,
430 F.3d 1036 (9th Cir. 2005) ...................................................................21

*De Sylva v. Ballentine*,
351 U.S. 570 (1956) ..................................................................................10

*Ellison v. Robertson*,
357 F.3d 1072 (9th Cir. 2004) .....................................................................9

*Fred Fisher Music Co. v. M. Witmark & Sons*,
318 U.S. 643 (1943) ...................................................................10, 11, 26

*Free v. Bland*,
369 U.S. 663 (1962) ..................................................................................25

*Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*,
716 F.3d 302 (2d Cir. 2013) .......................................................................11

*Goldstein v. California*,
412 U.S. 546 (1973).......................................................................7, 23

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
471 U.S. 539 (1985).......................................................................21

*Leever v. Carson City*,
360 F.3d 1014 (9th Cir. 2004) .......................................................................8

*In re Marriage of Worth*,
195 Cal. App. 3d 768 (Ct. App. 1987).......................................................................25

*Miller Music Corp. v. Charles N. Daniels, Inc.*,
362 U.S. 373 (1960).......................................................................10

*Mills Music, Inc. v. Snyder*,
469 U.S. 153 (1985).......................................................................11, 19

*Multi Time Mach., Inc. v. Amazon.com, Inc.*,
804 F.3d 930 (9th Cir. 2015) .......................................................................8

*Penguin Grp. (USA) Inc. v. Steinbeck*,
537 F.3d 193 (2d Cir. 2008) .......................................................................20

*Peretti v. Authentic Brands Grp. LLC*,
33 F.4th 131 (2d Cir. 2022) .......................................................................16

*Rano v. Sipa Press, Inc.*,
987 F.2d 580 (9th Cir. 1993) .......................................................................23

*Ray Charles Foundation v. Robinson*,
795 F.3d 1109 (9th Cir. 2015) .......................................................................22

*Republic of Ecuador v. Mackay*,
742 F.3d 860 (9th Cir. 2014) .......................................................................18, 19, 27

*Rossi v. Motion Picture Ass'n of Am. Inc.*,
391 F.3d 1000 (9th Cir. 2004) .......................................................................9

*Stewart v. Abend*,
495 U.S. 207 (1990)....................10, 12, 14

*United Com. Ins. Serv., Inc. v. Paymaster Corp.*,
962 F.2d 853 (9th Cir. 1992)....................32

*Vetter v. Resnik*,
163 F.4th 951 (5th Cir. 2026)....................5

*Walthal v. Rusk*,
172 F.3d 481 (7th Cir. 1999)....................23

*United States ex rel. Welch v. My Left Foot Children's Therapy, LLC*,
871 F.3d 791 (9th Cir. 2017)....................31, 32

*Wilson v. Dynatone Publ'g Co.*,
892 F.3d 112 (2d Cir. 2018)....................11

*Wissner v. Wissner*,
338 U.S. 655 (1950)....................25

**Statutes**

17 U.S.C. § 106....................23

17 U.S.C. §§ 203, 304....................10, 22, 24

17 U.S.C. § 301(a)....................23

17 U.S.C. § 304.................... 1, 2, 3, 5, 8, 9, 12, 13, 15, 17, 18, 19, 20, 21, 26, 27, 29

17 U.S.C. § 304(c)....................2, 6, 7, 12, 14, 23

17 U.S.C. § 304(c)(2)....................13, 25, 27, 29

17 U.S.C. § 304(c)(4)(A)....................5

17 U.S.C. § 304(c)(5)....................13, 14, 25

17 U.S.C. § 304(c)(6).................... 15, 16, 18, 27, 28, 29

28 U.S.C. § 1291....................2

28 U.S.C. §§ 1331 and 1338(a)....................1

Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq* ......... 1, 5, 9, 10, 11, 12, 14, 16, 18, 19, 20, 23, 25, 26

Copyright Act of 1909 ...................................................................9, 10, 11, 13, 26, 27

Cal. Prob. Code §§ 6400 *et seq*..........................................................................4

## INTRODUCTION

This case centers on rights to musical compositions authored by Salvatore "Sonny" Bono prior to 1974, including the classic "I Got You Babe," and to what extent Sonny's 1978 Marital Settlement Agreement (the "MSA") with Plaintiff-Appellee Cher still controls the rights to those compositions after Sonny's heirs, including his widow, Defendant-Appellant Mary Bono, issued a notice of termination in 2016 under 17 U.S.C. § 304 to his original publishers, terminating Sonny's original grant of rights in those compositions.

Mary brings this appeal for two reasons. First, to rectify the District Court's misapplication of 17 U.S.C. § 304. Section 304 explicitly gives Sonny's children and his widow Mary (together, the "Heirs") the right to terminate his copyright grants and receive all reverted rights, *notwithstanding* the MSA. Second, Mary brings this appeal to rectify an incorrect interpretation of the MSA. The District Court's misreading of the MSA created new restrictions on the Heirs' ability to select a royalty administrator.

Mary therefore respectfully requests that this Court reverse and remand for entry of judgment that (1) all rights and future royalties in the compositions reverted to the Heirs free of Cher's MSA rights, or alternatively that the publishers' share reverted to the Heirs while the rest remains governed by the MSA; and (2) Mary, subject to the other Heirs' rights, has sole discretion to appoint a worldwide royalty administrator, including any of the Heirs, and approve up to a ten percent administration fee without the District Court's added restrictions.

## STATEMENT OF JURISDICTION

The District Court had subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a) because the action required the interpretation of the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.*, specifically the scope, meaning,

and effect of the statutory termination provisions of 17 U.S.C. § 304(c). This Court has appellate jurisdiction under 28 U.S.C. § 1291 because this appeal is from a final judgment. The District Court entered the judgment on November 26, 2025. (ER-4-7.) Defendant-Appellant Mary Bono filed her notice of appeal with the District Clerk on December 22, 2025. (ER-165-170.) This appeal is timely pursuant to Federal Rules of Appellate Procedure 4(a)(1)(A). This appeal is from a final judgment that disposes of all parties' claims.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

I. Does an agreement entered into by an author before the vesting of any of his or his heirs' termination rights under 17 U.S.C. § 304 encumber the copyrights and the copyright royalties that revert to the author's statutory heirs pursuant to 17 U.S.C. § 304?

II. Does the Marriage Settlement Agreement allow Sonny Bono's heirs to appoint a worldwide royalty administrator, including themselves, at their sole discretion, who receives ten percent of the gross proceeds of those royalties?

## PERTINENT LEGAL PROVISIONS

The legal authorities pertinent to this appeal are set out verbatim in the Addendum to the Briefs filed with this brief.

## STATEMENT OF THE CASE

### I. Factual Background

#### A. During Sonny's Lifetime

In or about 1964, Plaintiff-Appellee Cher and Sonny Bono began performing together and recording multiple musical compositions written by Sonny. Sonny signed an agreement in 1966 (the "1966 Agreement"), granting rights to compositions he authored to his original publishers (the "Publishers' Share"). (ER-8-25.) For most of the compositions, including the classic "I Got You Babe,"

Sonny granted a thirty-percent interest in the income to his publishers. (ER-8, 17-18.)

Sonny and Cher married in 1967 and their marriage dissolved in 1975. (ER-26.) In 1978, Sonny and Cher entered into the MSA, governed by California law, to, among other reasons, "settle the obligations of the parties to each other with respect to their … property interest and rights," including community property. (ER-53, ER-27.)

Two terms of the MSA are relevant to this appeal. First, the MSA grants Cher (i) fifty percent of Sonny's income for musical compositions he authored prior to February 1, 1974 (the "Compositions"), including prior to their marriage; and (ii) the right to approve third-party uses of the Compositions. (ER-27, 59-61.) Second, the MSA grants Sonny the right to engage a royalty administrator who could receive a fee of up to ten percent of the gross, worldwide income from the Compositions. (ER-59-61.) The selection of the administrator "shall be subject to [Sonny]'s sole discretion." (*Id.*)

During his lifetime, Sonny appointed himself as the royalty administrator and collected the ten percent fee himself. (ER-39.) The division of One Dollar in income from most Compositions was, therefore, as follows: $0.30 to the publishers, $0.385 to Sonny (a 7¢ administration fee plus half of the remaining 63¢), and $0.315 to Cher. This division is illustrated by the following diagram:




### B. Sonny's Death and His Heirs

Sonny died intestate in 1998, leaving behind his widow of twelve years, Defendant-Appellant Mary Bono, and four children – Christine, Chaz, Chesare, and Chianna (together with Mary, the "Heirs"). (ER-27.) Mary received one-third of Sonny's estate, while each of his children received one-sixth. (ER-77. *See* Cal. Prob. Code §§ 6400 *et seq*.) Upon Sonny's death, the Heirs became the successors in interest to Sonny with respect to Sonny's obligations and benefits under the MSA. This included administering and paying Cher a portion of many different royalty streams of Sonny's estate, including the income from the Compositions that Sonny owned when he entered into the MSA. The Heirs hired third-party royalty administrators to do what Sonny had done during his lifetime: administer the income from the Compositions pursuant to the MSA. (ER-27.) In January 2023, Cher sold her rights under the MSA, including all of the rights to the Compositions effective as of July 1, 2022, to a third party. (ER-28.)

**1. The Termination Notice**

In 2016, Mary, Chesare and Chianna issued a notice of termination under 17 U.S.C. § 304 (the "Termination Notice") to the successors-in-interest of the original publishers, recapturing for all of the Heirs the rights in the Compositions that Sonny granted to the original publishers pursuant to the 1966 Agreement. The right to issue any termination notice vested after Sonny's death. 17 U.S.C. § 304(c)(4)(A); *see also Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 983 (9th Cir. 2008). The effective dates of termination ranged from 2018 to 2026, depending on the Composition. (ER-27-28.) The MSA was not terminated, and remains in effect, governing various aspects of Cher's and Sonny's property. Through the MSA, Cher maintains a right to various properties in which Sonny had an interest, including record royalties and television shows (to the extent she has not sold her interest).

Based on the Heirs' position that all rights of copyright in each Composition reverted fully to them upon the effective dates of each termination, notwithstanding the MSA, the Heirs stopped paying Cher fifty percent of United States royalties from the Compositions.[1] (ER-28.) Cher sued Mary, claiming that Cher had a continued right to fifty percent of all of the Heirs' income from the Compositions.

**2. The Royalty Administrator**

Cher has challenged Mary's right to appoint a royalty administrator and left the status of any such administrator in limbo. Mary counter-claimed to confirm her

[1] The Fifth Circuit recently held, in *Vetter v. Resnik*, 163 F.4th 951 (5th Cir. 2026), aff'd sub nom. *BMG Rts. Mgmt. v. Vetter*, No. 25-1391, 2026 WL 3116604 (U.S. Oct. 19, 2026), that terminations under the Copyright Act effect a reversion of worldwide rights. While this issue could ultimately affect whether the Termination Notice reaches non-U.S. royalties, it is not before the Court.

right under the MSA, subject to the rights of the other Heirs, to appoint a worldwide administrator, including herself or an entity that she controls, at her sole discretion, subject only to a limit of ten percent on the administration fee.

## II. Procedural History

Cher filed her Complaint for Declaratory Relief; and Breach of Contract on October 13, 2021. (ER-171.) Mary filed a motion to dismiss on December 8, 2021. (ER-172.) The Court granted the motion in part, with leave to amend, and denied it in part on March 14, 2023. (ER-149-158.) On March 14, 2023, Mary filed an answer to the complaint and counterclaim. (ER-175.) On March 28, 2023, Cher filed her First Amended Complaint (the "FAC".) (ER-127-148.) Mary filed the Answer to the First Amended Complaint for Declaratory Relief and Breach of Contract; Restatement of Counterclaims on April 11, 2023. (ER-98-126.) Cher filed an Answer to Defendant's Counterclaims on May 2, 2023. (ER-82-97.)

In the first claim in the FAC, Cher asserted a claim for declaratory relief regarding the effect of the Bono Heirs' Section 304(c) termination on her rights under the MSA. (ER-127-148.) In the second claim, Cher asserted that Mary breached the MSA by (i) not paying Cher "fifty percent of the United States Composition Royalties"; (ii) "[r]epudiating Plaintiff's approval rights" for third-party agreements; (iii) "[r]epudiating Plaintiff's right to terminate the Wixen Agreements; (iv) allowing administrative fees above the limit in the MSA; and (v) "[r]efusing to honor Plaintiff's election to have her fifty percent of Record Royalties paid directly to her." (ER-127-148.) In her counterclaims, Mary asserted claims for declaratory relief (i) regarding Cher's rights and obligations concerning the selection of an administrator and (ii) Mary's rights and obligations under the MSA, including the negotiation and entry into new agreements to exploit Sonny's sound recording copyrights. (ER-82-97.)

The claims and counterclaims were based on well-established facts and

disputed questions of law. The District Court, therefore, resolved the matter on summary judgment. After briefing and oral argument, held on February 26, 2024, the Court denied Mary's motion as to all issues presented except for her first counterclaim, which was granted in part. (ER-26-40.) The Court granted Cher's motion as to all remaining issues except for her second claim for breach of contract, which was granted in part on May 29, 2024. *Id*.

More specifically, regarding the first question presented in this appeal, the District Court focused extensively on family law questions and, in particular, spousal support, even though the parties agree that the MSA is a contract like any other. (ER-160-163 (extensive discussion of spousal support); Plaintiff's and Defendant's Supplemental Briefs in Opposition to Motion to Dismiss (ER-173), respectively (engaging with the District Court's hypotheticals regarding spousal support); ER-43-46 (questions at hearing regarding spousal support). *See also* ER-42 (District Court noting its familiarity with family law and its previous work as a family court judge in superior court). *Cf.* ER-53-54 (spousal support waived by the MSA)). This unfortunately led the District Court to err by failing to acknowledge that the federal Copyright Act preempts state law on the issue of copyright terminations. *See Goldstein v. California*, 412 U.S. 546, 561 (1973).

On the second question presented in this appeal, the District Court read language and conditions into the MSA that do not exist in its text and that contradict the long-standing conduct of the parties to the MSA.

The District Court issued the final judgment on November 26, 2025. (ER-4-7.) Mary filed her notice of appeal with the District Clerk on December 22, 2025. (ER-165-170.)

## SUMMARY OF ARGUMENT

I. An author may not encumber the rights of copyright that revert to the author's statutory heirs pursuant to 17 U.S.C. § 304 before the termination rights vest in either the author or the author's heirs. Those rights include the right to royalties arising from the works. Further, those rights vest only when the right to serve a termination notice arises, which here occurred well after Sonny's death. Therefore, Sonny could not have alienated Mary's right, as his widow, to the post-termination copyright interests when he entered into the MSA in 1978. Despite any language to the contrary in the MSA, all of the reverted rights, including the right to receive royalties, belong to the Heirs.

II. The MSA allows Mary, subject to the right of the other Heirs, to appoint a worldwide royalty administrator, including the Heirs themselves or an entity that they control, at her sole discretion and to pay that administrator a fee of up to ten percent of the gross proceeds of those royalties. The District Court misinterpreted the MSA by adding additional qualifications to the Heirs' rights, finding that Cher "may raise reasonable objections to the terms of any such agreement entered into with such a royalty administrator, including as to the reasonableness of the administration fee and as to the administrator's credentials and qualifications." The District Court's interpretation means that the Heirs do not actually have "sole discretion" because they would need Cher's approval.

## ARGUMENT

### I. Standard of Review

The Court reviews grants of summary judgment *de novo*. *Multi Time Mach., Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 935 (9th Cir. 2015). "Viewing the evidence in the light most favorable to the nonmoving party," the Court "must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Leever v. Carson*

*City*, 360 F.3d 1014, 1017 (9th Cir. 2004). The Court specifically "review[s] *de novo* the district court's interpretations of the Copyright Act" on summary judgment. *Rossi v. Motion Picture Ass'n of Am. Inc.*, 391 F.3d 1000, 1002–03 (9th Cir. 2004); *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004).

## II. The District Court Failed to Apply Section 304

### A. The Relevant History of the Copyright Terminations

This matter should be resolved by the straightforward application of the text of Section 304. The District Court, however, struggled with the concept that copyright terminations preempted Sonny's right to contract freely and bargain away his heirs' rights under Section 304. The history of and the purpose of copyright terminations illustrate why Section 304 trumps the common law's freedom to contract and explains how Section 304 should be applied to the dispute between Cher and Mary.

#### 1. The Copyright Act of 1909

Since the Copyright Act of 1909 (the "1909 Act"), Congress has sought to allow authors and their heirs a chance to recapture the economic value of copyrighted works that the author bargained away early in his or her career. The mechanism set forth in the 1909 Act was an inalienable right of the author, or the author's heirs, to a second, or renewal, term of copyright. This renewal term "was intended to benefit authors by enabling them or their families to have a second opportunity to market their works after an original sale of the copyright." 3 NIMMER ON COPYRIGHT § 9.02 (footnote omitted) ("the renewal provision was clearly intended to benefit authors"). As the House Report for the 1909 Act explained: "It not infrequently happens that the author sells his copyright outright to a publisher for a comparatively small sum. If the work proves to be a great success and lives beyond the term of twenty-eight years, your committee felt that it should be the exclusive right of the author to take the renewal term, and the law

should be framed as is the existing law, so that he could not be deprived of that right." *Id*. (quoting H.R. Rep. No. 2222, 60th Cong., 2d Sess. p. 14); *see also Stewart v. Abend*, 495 U.S. 207, 218 (1990). When the first term of copyright expired, the author or, if the author had died, the author's heirs could apply to renew the copyright for a second term. This allowed them to obtain better terms for the sale or license of a valuable copyright, including, as Nimmer specifically notes, negotiating an increase in royalties. 3 NIMMER § 9.02 (noting that both the calculation and numerical amount of the royalty percentage would benefit from the author's improved bargaining position due to the renewal provision).

Much of the law's purpose was undone by the Supreme Court in *Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643 (1943). In a heavily criticized ruling, the Court held that "the Copyright Act of 1909 does not nullify agreements by authors to assign their renewal interests." *Id.* at 657-58. *See, e.g.*, 3 NIMMER § 9.06[B][1] (describing Justice Frankfurter's analysis of Congressional intent as "highly questionable"). After *Fisher*, predatory publishers could have authors sign over their renewal rights at the same time they assigned their copyrights to the publishers, negating the Congressional intent to allow authors to renegotiate their contracts later from a more powerful position. Nonetheless, heirs retained their rights to the renewal term: An author could only assign the renewal right if it vested in her- or himself. Even post-*Fisher*, an author could not alienate her or his ***heirs'*** right to the renewal term. *See Miller Music Corp. v. Charles N. Daniels, Inc.*, 362 U.S. 373, 375 (1960); *De Sylva v. Ballentine*, 351 U.S. 570, 582 (1956).

**2. The Copyright Act of 1976**

With the 1976 Copyright Act, Congress replaced the old system of two terms of copyright with a new system that included one, longer term of copyright, but it allowed authors or their statutory heirs to terminate transfers and licenses after at least 35 years. 17 U.S.C. §§ 203, 304. The purpose was the same: to grant

authors or their heirs the financial benefit of being able to renegotiate agreements for their works. *See, e.g.*, *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172-73 (1985) ("the termination right was expressly intended to relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work product."); *Classic Media*, 532 F.3d at 984 ("Without such a right of termination, the Extended Renewal Term [the Copyright Act's extension of copyrights by 19 years] would constitute a windfall to grantees.").

**(1) A New and Unencumbered Property Right**

Terminated rights under the 1976 Copyright Act are similar to the "second term of copyright" under the 1909 Act. "[T]he extended term [of the 1976 Copyright Act] represents a completely new property right[.]" *Classic Media*, 532 F.3d at 984 (quoting H.R.Rep. No. 94–1476, at 140 (1976)). "The renewal term of a copyright is not merely an extension of the original copyright term but a 'new estate … clear of all rights, interests or licenses granted under the original copyright.'" *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (quoting *P.C. Films Corp. v. MGM/UA Home Video Inc.*, 138 F.3d 453, 457 (2d Cir. 1998)); *see also Wilson v. Dynatone Publ'g Co.*, 892 F.3d 112, 117 (2d Cir. 2018) ("the renewal term is a 'new estate ... clear of all rights, interests or licenses granted under the original copyright.'") (quoting *G. Ricordi & Co. v. Paramount Pictures, Inc.*, 189 F.2d 469, 471 (2d Cir. 1951)).

Significantly, Congress overturned *Fisher* when it passed the 1976 Copyright Act by making clear that an author *could not* alienate her or his termination rights – let alone the rights of the author's heirs. Nimmer writes: "After judicial interpretation of the 1909 Act frustrated this intent by upholding advance assignments of renewal terms, Congress spoke unambiguously in 1976: 'Termination of the grant may be effected notwithstanding *any* agreement to the

contrary.'" 3 NIMMER § 11.07[A] (quoting §§ 203(a)(5), 304(c)(5)) (emphasis added by Nimmer) (footnotes omitted); *see also id.* § 11.01[B] ("Both the House and Senate Reports … characterize Section 203 as 'a provision safeguarding authors against unremunerative transfers.' It would seem to follow that the termination procedures therefore, cannot apply to prejudice the interest of authors."). The legislative history to Section 304 provides clear support for this:

> Because Congress concluded that alienable reversionary interests did not adequately protect authors in their relationships with publishers and other assignees of their works, it expressly rendered those rights inalienable and unwaivable when it granted the termination of transfer right under the current Act in 1976 and, again, via an amendment in 1998.

3 NIMMER § 11.07[B]; *Stewart*, 495 U.S. at 230 ("The 1976 Copyright Act provides a single, fixed term, but provides an *inalienable* termination right.") (emphasis added); *Classic Media*, 532 F.3d at 985 (applying this quote from *Stewart*, as it applies to § 203, to the identical language of its "close counterpart," § 304(c)). Congress was also clear that the new termination provisions would allow an author's surviving spouse and children to escape unfair deals for their post-termination rights:

> [U]nder the present renewal provisions [*i.e.*, before the Copyright Act of 1976], any statutory beneficiary of the author can make a valid transfer or license of future renewal rights, which is completely binding if the author is dead and the person who executed the grant turns out to be the proper renewal claimant. Because of this, a great many contingent transfers of future renewal rights have been obtained from widows, widowers, children, and next of kin, and a substantial number of these will be binding. After the present 28-year renewal period has ended, a statutory beneficiary who has signed a disadvantageous grant of this sort should have the

> opportunity to reclaim the extended term.

House Report No. 94-1476, 140-41 (1976) (legislative history of the 1976 Copyright Act).

#### (2) The Beneficiaries Are the Statutory Heirs

As with the 1909 Act, Congress spelled out the beneficiaries of termination rights: authors and, if the author has died, the author's surviving spouse and the author's children. § 304(c)(2). Notably, third parties and ex-wives are excluded. As the legislative history makes clear, the rights covered by a termination revert solely to the author or his or her statutory heirs:

> [A]ssuming that a copyright transfer or license is terminated under section 203, who are bound by the termination and how are they affected?
>
> Under the bill, termination means that ownership of the rights covered by the terminated grant reverts to everyone who owns termination interests on the date the notice of termination was served[.]

House Report No. 94-1476, 126-27 (1976).

### B. How the District Court Should Have Applied Section 304

This appeal may be resolved through the straightforward application of Section 304. In short, the rights covered by the Termination Notice revert to the Heirs as their sole and unencumbered property.

#### 1. Section 304(c)(5): The MSA Does Not Encumber the Heirs' Termination Rights

> Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant.

17 U.S.C. § 304(c)(5). This is the crux of the matter. A grant may be terminated "notwithstanding any agreement to the contrary." The terminated rights revert to the Heirs free and clear, unencumbered by any prior agreement made by Sonny. *See Stewart*, 495 U.S. at 230 (citing 17 U.S.C. §§ 203, 302) ("The 1976 Copyright Act provides a single, fixed term, but provides an inalienable termination right."); *Classic Media,* 532 F.3d at 985 (applying this quote from *Stewart*, as it applies to § 203, to the identical language of "its close counterpart," § 304(c)); *Corcovado Music Corp. v. Hollis Music, Inc.*, 981 F.2d 679, 684 (2d Cir. 1993) ("there is a strong presumption against the conveyance of renewal rights").

Nimmer provides an illustrative example of how a third-party's rights that stem from a grant of a copyright are limited by the terms of the grant, whether the limits are contractual or statutory:

> Suppose that author *A* grants copyright in his work to *B*, and *B* in turn grants such copyright to *C*. *A* clearly has a right of termination against *B*. Because the grant to *C* was executed neither by the author, nor by a renewal claimant, it might be argued that no statutory right of termination exists against *C*. Even if this were true, it would not mean that *C* might continue to enjoy the benefit of his grant from *B* although *B*'s rights had been terminated by *A*. *C's rights would be cut off simply because he can succeed to no greater rights than B had the power to convey.* Without *A*'s grant to *B*, *C* would be an infringer of *A*'s copyright. If the original grant from *A* to *B* had by its terms provided for a reversion to *A* thirty-five years after execution, *B* would lack the power to convey rights to *C* beyond such thirty-five-year period. *The fact that reversion from B to A occurs by operation of law rather than by the express terms of the grant to B does not enlarge the rights that B can convey to C.*

3 NIMMER § 11.02[A][4][b] (emphasis added). The example illustrates that a third-party's rights that stem from a grant of a copyright are limited by the terms of the grant, whether the limits are contractual or statutory. Here, Cher's rights are limited to what Sonny could have conveyed in 1978. He could not have conveyed the Heirs' post-termination interests.

Any subsequent agreement that would take a portion of the proceeds of the terminated grant is an agreement to the contrary. To hold otherwise would be counter to the text and intent of Section 304 and would improperly elevate form over substance. If the MSA took one hundred percent of the Composition royalties, it would effectively bar the Heirs from exercising their termination rights. All of the rights revert to the Heirs, notwithstanding the MSA.

**2. Section 304(c)(6)(B)-(D): The Rights Vested in the Heirs Well After Sonny's Death**

Section 304(c)(6) clearly states that the rights at issue vested in the Heirs only when they did – or could have – served the Termination Notice:

> In the case of a grant executed by one or more of the authors of the work, all of a particular author's rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to that author or, if that author is dead, to the persons owning his or her termination interest under clause (2) of this subsection... In all cases the reversion of rights is subject to the following limitations:
> …
> (B) The future rights that will revert upon termination of the grant become vested on the date the notice of termination has been served

As discussed previously, the rights vested years after Sonny's death.

Section 304(c)(6)(D) makes it clear that the MSA, agreed to in 1978, could not have reached any right covered by the Termination Notice:

> A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination.

In other words, the rights governed by copyright terminations were inalienable until they vested in the Heirs after Sonny's death. *See Peretti v. Authentic Brands Grp. LLC*, 33 F.4th 131, 139 (2d Cir. 2022) (author could not have transferred renewal rights to third party because author died before termination right vested in author and thus author "did not own the contingent rights held by" his statutory heirs); 3 NIMMER § 9.06[B][1] ("if the author does not survive until such time as the renewal vests, then the next succeeding class under Section 304(a) may obtain the renewal rights free and clear of any prior assignment (or other transfer) executed by the author"); *id.* § 9.06[C] ("in the usual case where an assigning author does not survive to renewal vesting, his widow and children acquire renewal right *unencumbered by any prior assignments*") (emphasis added). Because Sonny could not alienate an inalienable right, any rights to royalties after these copyrights were terminated were simply never on the table when Sonny and Cher agreed to the MSA in 1978.

**(1) All Rights Revert under Section 304(c)(6)**

Section 304(c)(6) clearly states what reverts: ***all*** of the rights of copyright, including the right to royalties.

> In the case of a grant executed by one or more of the authors of the work, all of a particular author's rights under this title that were covered by the terminated grant revert[.]

The phrase "all rights under this title" *must* refer to copyright royalties. If royalties were not a right under the Copyright Act, it would lead to the absurd result that no monetary benefit would arise from any termination. Yet, as discussed above, the

fundamental purpose of copyright terminations is financial renumeration. *See, e.g.*, *Classic Media*, 532 F.3d at 984 ("with the termination of transfer provisions, authors or their heirs are able to negotiate additional compensation for previously granted rights.") In the case at hand, the original publishers could have symbolically returned the ownership of copyright, but retained their 30% share of royalties. This kind of contractual sleight of hand should not deprive authors and heirs of their termination rights. To hold otherwise would again run counter to the text and intent of Section 304 and improperly elevate form over substance. *See id.* at 985–86 ("the 'notwithstanding any agreement to the contrary' language was intended to protect against attempted contractual circumvention of the termination right") (citing *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 284, 290-91 (2d Cir. 2002)).

The use of the verb "effect" in (c)(5) – "Termination of the grant may be effected notwithstanding any agreement to the contrary" – further supports the conclusion that all the rights of copyright that revert include royalties. The verb "effect" means "to succeed in doing or achieving (something)**:** to cause or bring about (something)" or "to put into operation." *Effect*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/effect (last visited Nov. 17, 2026). It indicates a substantive result. In this case, Section 304 effects a substantive reversion of all rights of copyright, including royalties, to the Heirs, notwithstanding the MSA.

**(2) Section 304(c)(6)(E) Must Be Read as a Whole**

The District Court's error arose in large part by its misplaced focus on only a fraction of Section 304(c)(6)(E), the part that reads "Termination of a grant … in no way affects rights arising under any other Federal, State, or foreign laws." Reading the entirety of Section 304(c)(6)(E) (omitted words bolded for emphasis) leads to the correct result.

> Termination of a grant **under this subsection affects only those rights covered by the grant that arise under this title,** and in no way affects rights arising under any other Federal, State, or foreign laws.

The first half of this sentence means that a termination reaches only rights under the Copyright Act. Read in tandem with Section 304(c)(6), its purpose is to delineate that *all* of the rights of copyright revert, but not other rights. That meaning is emphasized by – not undercut by – the second subclause. As an example, termination of a grant that covers both trademark and copyright rights would reach only the copyright rights.

Reading the entire text of Section 304(c)(6)(E) also strongly supports Mary's position that termination reaches copyrights and their accompanying royalties. If royalties were not "rights … that arise under this title," then no termination would affect them. This cannot be the case. The only reasonable interpretation is that Section 304 effects the reversion of copyrights and their accompanying royalties. A *grant* is by written instrument, and almost always by contract. It would be absurd for the first half of Section 304(c)(6)(E) to allow for the termination of a contract arising under state law, while the second half forbids it. *See, e.g.*, *Republic of Ecuador v. Mackay*, 742 F.3d 860, 864 (9th Cir. 2014) ("When interpreting a statute, words and phrases must not be read in isolation, but with an eye toward the 'purpose and context of the statute.'") (quoting *U.S. v. Petri*, 731 F.3d 833, 839 (9th Cir. 2013) (itself quoting *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006)).

### 3. Section 304(c)(6)(A) Further Supports Mary's Position

The District Court's ruling also renders the derivative work exception of Section 304 meaningless. It states, in relevant part, "A derivative work prepared under authority of the grant before its termination may continue to be utilized

under the terms of the grant after its termination[.]" § 304(c)(6)(A). As discussed in *Mills Music*, this is intended to exempt duly authorized derivative works entirely from the termination mechanism. 469 U.S. at 173-78. However, if the District Court's position is correct that a subsequent grant of rights – *i.e.*, a contract – is not affected by Section 304, then the derivative work exception is not necessary. *See, e.g., Republic of Ecuador*, 742 F.3d at 864 ("[i]t is a 'cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant.'") (quoting *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 643 (9th Cir.2012) (itself quoting *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 691 (9th Cir.2003))).

### C. Where the District Court Erred

#### 1. The MSA Could Not Alienate the Heirs' Termination Rights

The District Court ignored that the MSA never granted Cher an interest in the post-termination term of the Compositions. The post-termination extension term was a new and unencumbered property right that become the sole property of the Heirs. That interest never vested in Sonny because he died before the right could be exercised. Further, Sonny's interest in the post-termination extension term was inalienable under the Copyright Act, as discussed above.

The District Court held that the Copyright Act was inapplicable because "the MSA did not refer to a 'grant of a transfer or license' of the underlying copyrights" and only referred to a right to the 'contingent receipts . . . from musical compositions and interest therein.'" (ER-35, 36.) Even if Sonny had given Cher a "grant of a transfer or license of the underlying copyrights," instead of "contingent receipts," however, the result would be the same. Sonny simply could never have given Cher a post-termination interest in the copyrights or the attendant royalty stream.

The District Court also held that the MSA could not have been terminated under Section 304 because it was executed after January 1, 1978. (ER-36.) This is irrelevant because the parties agree that the MSA was not terminated. Rather, Cher's stream of Composition royalties was cut off by the Heirs' termination of the grants to the publishers.

### 2. The Heirs Are Bound to the MSA Only to the Extent of Sonny's Rights

The language of the MSA binds Sonny's "heirs and assigns," but the MSA only applies to property and claims that are the subject of the MSA. As discussed above, the extension term interest did not become an alienable property interest until after Sonny's death. *See Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193, 198 (2d Cir. 2008) ("[The 1976 Copyright Act] created for authors or their statutory heirs … an inalienable right to terminate the grant of a transfer or license."). An inalienable right is "[a] right that cannot be transferred or surrendered." Black's Law Dictionary (11th ed. 2019). In other words, Sonny could not have entered into an agreement in 1978 to transfer a property right that came into existence – and vested in the Heirs, not him – in 2016.

A helpful comparison is Sonny's interest in the television program "The Sonny and Cher Comedy Hour." Mary inherited one-third of Sonny's share of the show via intestate succession. After Sonny's death, Mary purchased for herself and her two children with Sonny an additional share from a producer of the show. (ER-50-51.) The MSA grants Cher half of the receipts of "Sonny and Cher" television programming. (ER-61-62.) Even Cher agrees that she is not entitled to any royalties from the share that Mary purchased from the show's producer after Sonny's death. That is because the MSA reaches only the property Sonny owned when he signed the MSA. Sonny could not sign away the share of "The Sonny and Cher Comedy Hour" that he did not own. He also could not sign away his Heirs'

termination rights because they did not belong to him, could not be alienated, and did not even exist in 1978.

### 3. Royalties Are Rights that Revert to the Heirs

The District Court incorrectly held that, for purposes of Section 304, "a right to receive royalties is distinct from a grant of copyright," finding that "the MSA did not refer to a 'grant of a transfer or license' of the underlying copyrights" and only referred to a right to the 'contingent receipts . . . from musical compositions and interest therein.'" (ER-35-36.)

Courts, including the Supreme Court, have long understood that royalties from copyrighted works inherently derive from their copyrights. *See Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 546-47 (1985) ("Under the Copyright Act, these rights – to publish, copy, and distribute the author's work – vest in the author of an original work from the time of its creation… [T]he author commonly sells his rights to publishers who offer royalties in exchange for their services in producing and marketing the author's work."). The rights in Section 304 are valueless without the right to collect royalties because authors and their heirs to recapture the *economic value* of the renewal term of authors' copyrights. *Classic Media*, 532 F.3d at 984; NIMMER § 11.01[A]. This necessarily includes the right to collect royalties from those copyrights. *Milne ex rel. Coyne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1047 (9th Cir. 2005) (increasing royalties to heirs is "the very result envisioned by Congress when it enacted the termination provisions"); *Bourne Co. v. MPL Commc'ns, Inc.*, 675 F. Supp. 859, 863 (S.D.N.Y. 1987), *modified*, 678 F. Supp. 70 (S.D.N.Y. 1988) ("the right to receive royalties during the renewal term is the most valuable part of the termination rights."). When a copyright is recaptured, any third party's right to royalties must end for the author's – or the deceased author's heirs' – economic right to be complete.

This Court ruled on a similar issue in *Ray Charles Foundation v. Robinson*, 795 F.3d 1109, 1119 (9th Cir. 2015). During his career, Ray Charles entered into contracts with music publishers that granted the publishers the copyright interests in exchange for advance payments and future royalties. *Id.* at 1111-12. When Charles died in 2004, Charles granted this "right to receive future royalty streams" to the Ray Charles Foundation (the "Foundation") in his will. *Id.* at 1112, 1115. Charles did not grant or transfer copyright interest themselves because those still belonged to the publishers. *Id.* at 1112. Charles's statutory heirs later served notices to terminate the copyright grants under Sections 203 and 304. *Id.* at 1113-14. The Foundation sought a ruling on the validity and effectiveness of the termination notices. *Id.* at 1114. The district court dismissed the case for lack of standing because the Foundation was neither the grantee nor a statutory heir, only the recipient of "the right to receive future royalty streams." *Id.* at 1115-16. The Ninth Circuit reversed, ruling that the nonprofit had third-party standing, even though it was "not a party expressly mentioned in the termination statutes." *Id.* at 1123.

While *Ray Charles Foundation* was a ruling about standing, the Court's reasoning is relevant here. "It is undisputed that copyright ownership lies with [the publisher], but just as the termination notices affect [the publisher's] ownership of copyrights, they also directly affect the Foundation's right to royalties." *Id.* at 1119 (citing 17 U.S.C. §§ 203(b), 304(c)(6); *Larry Spier, Inc. v. Bourne Co.*, 953 F.2d 774, 780 (2d Cir.1992)). The Court explained that the Foundation's "interest in continuing to receive the royalty stream generated by Charles's works" was "the same interest that the Terminating Heirs seek to redirect to themselves." *Id.* at 1123. Thus, the heirs' "effective termination would deprive [the Foundation] of the right to receive prospective royalties." *Id.* at 1119 (citing *Larry Spier*, 953 F.2d at 780).

Here, royalties from the Compositions are fundamental to the Heirs' rights under copyright because royalties are the price exacted for authorizing others to exercise such rights.

In addition to improperly severing copyright royalties from copyrights themselves, the District Court ignored the fact that Cher retained a right to authorize uses of the Composition. (ER-59-61.) The right to authorize the use of a work is clearly a fundamental right of copyright. 17 U.S.C. § 106 ("the owner of copyright under this title has the exclusive rights to do *and to authorize* any of the following [list of exclusive rights.]") (emphasis added).

#### 4. The Statutory Heirs Are Sonny's Children and Widow

##### (1) State Family Law and Contract Law Cannot Preempt Copyright Termination Provisions

The District Court's focus on family law questions, and, in particular, spousal support, unfortunately led it to err by failing to acknowledge that the Copyright Act preempts state law. *See Goldstein*, 412 U.S. at 561; *Chae v. SLM Corp.*, 593 F.3d 936, 941 (9th Cir. 2010) (quoting U.S. Const. art. VI, cl. 2) (federal law "shall be the supreme Law of the Land"); 17 U.S.C. § 301(a) (providing that all legal and equitable rights that "come within the subject matter of copyright ... are governed exclusively by this title"). The Ninth Circuit has held that Section 203, which is interpreted in tandem with Section 304(c), *preempts California contract law when they conflict*. *Rano v. Sipa Press, Inc.*, 987 F.2d 580, 585 (9th Cir. 1993);[2] *see also Classic Media,* 532 F.3d at 985 (§§ 203 and 304(c)

---

[2] Courts have criticized *Rano* regarding a here-irrelevant minimum license term, but agree with its holding that Section 203 preempts contract law when there is a conflict. *See, e.g.*, *Walthal v. Rusk*, 172 F.3d 481, 485 (7th Cir. 1999) ("as the *Rano* court correctly points out, state contract law cannot provide the basis of a decision if that law conflicts with federal law. Under the principle of preemption, for

are "close counterparts" with identical language and should be interpreted in tandem where appropriate).

According to the District Court, while "[Cher's] rights under the MSA are linked to the musical compositions and Sonny's corresponding property interests," "[Cher's] rights under the MSA arise solely under state law" because "the MSA did not refer to a "grant of a transfer or license" of the underlying copyrights." (ER-35.) Further, the District Court cited to Section 304(c)(6)(E)'s language that copyright terminations "in no way affect[s] rights arising under any other Federal, State, or foreign laws" to support its finding that "the Notice of Termination cannot affect [Cher's] contractual right to receive financial compensation in exchange for the release and permanent discharge of any and all claims arising out of her marital relationship with Sonny." (ER-35.)

The case of *Boggs v. Boggs* is instructive. 520 U.S. 833 (1997). There, the Supreme Court found that a deceased man's children from an earlier marriage were not entitled to their father's ERISA-governed retirement benefits, to which they were entitled under state law, because Congress, through ERISA, had granted an inalienable right (to the retirement benefits) to specific statutory heirs (in this case, the surviving wife). Like ERISA in *Boggs,* the termination provisions of federal law – Sections 203 and 304 – are designed to protect and benefit Sonny's widow and children, not his publishers, nor one of his ex-wives, nor her assignee. *See Brown-Thomas v. Hynie*, Case No. 2:18-cv-00307-SVW-JPR, 2018 WL 3811353, at *1 (C.D. Cal. Aug. 7, 2018) ("A previous spouse is not entitled to termination

---

instance, in light of the existence of § 203, *we could not use common law rules for the interpretation of contracts to require that a contract for the life of the copyright be enforced for that length of time. That interpretation would be in direct conflict with § 203*.") (emphasis added) (citation omitted).

interests."). Congress identified exactly who it was protecting and benefiting by naming the heirs who can terminate the grants if the author is deceased: the author's surviving spouse and descendants. 17 U.S.C. § 304(c)(2). *See also Berry v. Berry*, 277 P.3d 968, 972, 988 (Haw. 2012) (finding a divorce decree that gave the non-authoring spouse the "rights, title and interest to any copyrights" preempted by the Copyright Act); *see also, e.g.*, *Free v. Bland*, 369 U.S. 663, 666 (1962) (federal law governs disposition of U.S. savings bonds) ("The relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for the Framers of our Constitution provided that the federal law must prevail."); *Wissner v. Wissner*, 338 U.S. 655 (1950) (federal law governs ownership of benefits from veteran's life insurance policy). An author is not permitted to disrupt this statutory scheme by naming other heirs. § 304(c)(2)(B); § 304(c)(5) ("Termination of the grant may be effected notwithstanding any agreement to the contrary, *including an agreement to make a will or to make any future grant*.") (emphasis added); 3 NIMMER § 11.07[B][3] ("This provision shows Congress's intent to give the author's statutory successors, *rather than the author's assignees or devisees*, the benefits of copyright recapture—including the new property right of an extended term of protection.") (emphasis added).

The District Court's citation to *Rodrigue v. Rodrigue* (ER-36) is misplaced and contradicted by *Boggs*, among others. 218 F.3d 432 (5th Cir. 2000). Cases such as *Rodrigue, Berry* and *In re Marriage of Worth*, 195 Cal. App. 3d 768 (Ct. App. 1987), are not about copyright terminations. They are about whether and to what extent an author's decision to marry another serves to alienate his or her rights of copyright. They do not suggest that an author can alienate a right that is – as it was here – both inalienable and unvested. Further, these cases specifically address the interplay between the Copyright Act and state laws governing marital property. That is inapplicable here. The MSA is a contract.

#### (2) The Statutory Heirs, Not an Ex-Wife, Are the Beneficiaries of Section 304

Though Cher played an integral role in Sonny's success and is Sonny's ex-wife, she is still a grantee and must be treated as such. Under the District Court's ruling, a publisher could evade the termination provisions of the 1976 Copyright Act simply by including a separate clause assigning royalties to the publisher. An author's heirs would be left with worthless post-termination copyrights which bear no additional royalties. Such a ruling would not only run contrary to the text of the 1976 Copyright Act, but it would eviscerate the purpose of its termination provisions, just as *Fisher* frustrated the purposes of the 1909 Act.

Further, Cher is not supposed to benefit from copyright terminations. Congress specifically intended for authors' surviving spouses, children, and grandchildren to benefit from termination rights. The extension term of the copyrights for Sonny's compositions, and all resulting benefits of their ownership, belong to Sonny's widow and four children, not an ex-spouse who already received nearly fifty years of royalties. Cher is legally equivalent to any third-party who obtained a royalty and approval right by contract prior to the vesting of the termination rights.

### 5. The District Court's Ruling Creates Chaos Regarding Ownership Interests of Heirs

Neither the District Court nor Cher ever addressed the question of what percentage of the Compositions or the Publishers' Share each of the Heirs now owns. That is because their logic – when applied to the Heirs – leads to illogical results.

As discussed above, fundamental to the District Court's ruling is that state law governs the transfers of Sonny's publishing interests. It held that Cher's approval rights over uses of the Compositions and fifty percent interest in the

royalties from the Compositions continues because it is based on a contract – governed by state law – that was not terminated. The Heirs received their interests by state law as well, through intestate succession. Mary received a one-third interest and each of Sonny's children received a one-sixth interest in his estate. If this right trumps the rights under Section 304 because termination in "no way affects rights arising under any other Federal, State, or foreign laws," then the reverted rights, including the Publishers Share, would be subject to this division (1/3, 1/6, 1/6, 1/6 and 1/6). But this renders the terms of Section 304(c)(2) – which states that a widow has one-half interest and surviving children share the other half – meaningless. *See, e.g.*, *Republic of Ecuador*, 742 F.3d at 864. This is no idle issue: All or virtually all heirs receive their interests through state law via wills, contracts, trusts, or laws of intestate succession.

## III. What Actually Reverted to the Bono Heirs? Two Approaches

Mary sets forth two alternate proposals for what reverts to the Heirs under a proper reading of Section 304.

### A. The Heirs Are Entitled to All of the Rights of Copyright

After the Heirs terminated Sonny's agreements with publishers and companies, the Heirs became the owners of copyrights as new and unencumbered interests, as discussed in the preceding sections. Mary's primary position is that the Heirs are now entitled to all of the rights of copyright to the Compositions, including the royalties. This is consistent with the text that "all rights" revert. 17 U.S.C. § 304(c)(6). It is also most consistent with the intent of Congress to bolster heirs' termination provisions vis-à-vis the 1909 Act. Under the 1909 Act, the extended term of copyright, including all attendant royalties, would clearly vest 100% in the Heirs.

### B. In the Alternative, The Grant Reverts

The alternative approach rests primarily on Section 304(c)(6), which states that "all of a particular author's rights under this title *that were covered by the terminated grant* revert[.]" (emphasis added). In other words, the Publishers' Share reverts solely to the Heirs. The Termination Notice terminated Sonny's grant of the Publishers' Share to the original publishers. The remainder – seventy percent for most Compositions – would continue to be subject to the MSA, including paying Cher half of the royalties after deduction of a ten percent administration fee.

Notably, this approach is what Cher testified that she wants. In reviewing a version of the chart depicted above (with the Publishers' Share incorrectly characterized as twenty percent[3]), she testified, "My concept is that I should get what I've always gotten." She testified further,

> Q But just to, I think, restate what you've testified to, if, from a dollar, you receive $0.36 before the terminations, you should receive $0.36 after the terminations; is that correct?
>
> *A Yes, I -- I believe I should have what I had before.*

(ER-80:6-18).

---

[3] Some of Mary's earlier pleadings before the District Court incorrectly refer to the Publishers' Share as 20%, based on deposition testimony of a royalty administrator. The Publishers' Share of each Composition is actually set forth in the 1966 Agreement, and specifically in its Schedule B ("Share of Income After Recoupment"), with the original publishers receiving 30% in most instances. (ER-17-18.) Sonny kept half as a "writer's share," and also retained an additional percentage – typically 40% – of the other half (commonly known as the "publisher's share") via his publishing dba, Chris-Marc Music. *Id*. For example, Sonny owned 70% of "I Got You Babe" (Song 10): 50% via all (100%) of the writer's share, and an additional 20% through 40% of the publisher's share.

In addition to the textual support of Section 304(c)(6), this position satisfies several requirements. First, while the entire copyright does not revert, some part of it – here, the Publishers' Share – reverts free and clear of all encumbrances, as a new property interest. Second, the benefits of the termination go the statutory heirs, as intended by Congress, and are not a windfall to Cher or her assignee. *See, e.g.*, *Classic Media*, 532 F.3d at 984. Third, the calculation of ownership interests is straightforward: The reverted Publishers' Share is owned in the shares set forth in Section 304(c)(2) while the remainder remains subject to both the MSA and probate law.

Some general public policy reasons also support this alternative approach. First, it allows for some certainty to a third-party who enters into agreements with an artist or writer regarding his or her royalties. At the time of contracting, a grantee would know what will happen to its interest if its own grant or if other grants are terminated. More specifically, it addresses the District Court's concerns that an author could deprive an ex-spouse of future income. To paraphrase Cher, the ex-spouse would have what they had before. Third, this ruling would allow an artist or his or her heirs to terminate unfavorable contracts while preserving other grants. Fourth, it significantly preserves the general right to freedom of contract and alienability of property, which courts sometimes struggle to harmonize with copyright terminations. Specifically, it would maintain Sonny and Cher's agreement as to the property owned by Sonny in 1978, while also respecting that the Heirs have never contracted away or otherwise alienated their reverted interests under Section 304.

For  all of the foregoing reasons, Cher is no longer entitled to half of the royalties for Sonny's U.S. composition copyrights. At the very most she is entitled to the share she had in the past, and she has no interest in the Publishers' Share.

## IV. The District Court Added Non-Existing Restrictions to the Heirs' Ability to Choose a Royalty Administrator

The second error of the District Court was to misinterpret the right granted to the Heirs under the MSA to appoint, at their sole discretion, themselves or any other person or entity as a worldwide royalty administrator of the income from the Compositions distributed to Cher.

The income from the Compositions is governed by Paragraph 10(d) of the MSA. Paragraph 10(d) is one long paragraph governing several different aspects of the parties' rights to Sonny's Compositions. (ER-59-61.) The first sentence defines Sonny's interests that are subject to the MSA (*i.e.*, royalties from the Compositions). (ER-59-60.) The second sentence address successors and assigns. (ER-60.) The next three sentences (the "Royalty Administrator Terms") govern the appointment of a royalty administrator:

> Husband agrees to account or to cause [his entity] Chris-Marc Music or other business to account directly to Wife or any company she designates 50% of said future income [of the Compositions] of Husband, Chris-Marc Music or other business, under this Paragraph 10(d). All said contingent receipts shall be subject to an administration fee to be kept and retained by the worldwide administrator(s), which administrator(s) to be engaged shall be subject to Husband's sole discretion. Said administration fee shall be a sum equivalent to 10% of the gross income actually received by Husband and Chris-Marc Music from all sources worldwide.

(ER-60.)

The immediately following two sentences of Paragraph 10(d) (the "Third-Party Agreement Terms") address Cher's right to approve third-party agreements for the Compositions, such as synchronization licenses:

> Husband agrees that all agreements with third parties respecting the subject matter of this Paragraph (10) (d) are subject to the approval of Wife or Wife's representatives which approval will not be unreasonably withheld. Husband agrees that any such agreements will be on substantially the same terms and conditions as any other agreements made by Husband with the same third parties with respect to subject matter which is not part of this Paragraph (10) (d).

(ER-60-61.) The final sentence of Paragraph 10(d) – irrelevant here – provides that Chris-Marc Music (Sonny's music publishing entity) shall remain under Sonny's control. (ER-61.)

The District Court correctly restated the relevant provision in its judgment:

> Defendant, subject to the rights of Sonny Bono's four children (the four children and Defendant referred to as the "Bono Heirs"), has the sole discretion to decide whom to appoint as the royalty administrator pursuant to the MSA, including an entity owned and controlled by the Bono Heirs; …

(ER-6.) This should have been it. Unfortunately, the District Court then wrongly incorporated the following caveat:

> … provided, however, Plaintiff may raise reasonable objections to the terms of any such agreement entered into with such a royalty administrator, including as to the reasonableness of the administration fee and as to the administrator's credentials and qualifications.

The District Court's interpretation of the MSA violates several cardinal rules of contract interpretation. First, it contradicts the Royalty Administrator Terms in that it renders meaningless the Heirs' "sole discretion" to appoint a royalty administrator and the ten percent fee that is specifically permitted. *See, e.g., United*

*States ex rel. Welch v. My Left Foot Children's Therapy, LLC*, 871 F.3d 791, 797 (9th Cir. 2017) (a "cardinal rule[] of textual interpretation … is the interpretative principle of *verba cum effectu sunt accipienda*—if possible, every word and every provision is to be given effect"). The Heirs do not have sole discretion if they need Cher's approval.

Second, when it comes to appointing a royalty administrator, the specific language of the Royalty Administrator Terms trumps the more general language of the Third Party Agreement Terms. *United States ex rel. Welch*, 871 F.3d at 797 (another "cardinal rule[] of textual interpretation … is the rule that the specific governs the general, or *generalia specialibus non derogant*") (citing and quoting *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 891 (9th Cir. 2003) ("A standard rule of contract interpretation is that when provisions are inconsistent, specific terms control over general ones")). Third, even if Third Party Agreement Terms limit the Royalty Administrator Terms, by their plain language they only limit an agreement with a *third party*, not with the Heirs, who are the heirs and assignees of Sonny. The conduct of the parties supports their understanding of this provision: During Sonny's lifetime, he served as this administrator and paid himself the ten percent fee. (ER-39, 49.) *See, e.g., United Com. Ins. Serv., Inc. v. Paymaster Corp.,* 962 F.2d 853, 856 (9th Cir. 1992) ("Under California law, the intent of the parties determines the meaning of the contract. The relevant intent is 'objective'—that is, the intent manifested in the agreement and by surrounding conduct") (citing, among others, Cal. Civ. Code §§ 1636, 1638).

Just as Sonny appointed himself the royalty administrator during his lifetime, Mary has, subject to the rights of the other Heirs, the sole discretion to decide whom to appoint as the royalty administrator pursuant to the MSA, including any of the Heirs themselves or an entity owned and controlled by the Heirs, and pay that administrator up to a ten percent fee for those services.

## V. Conclusion

For the foregoing reasons, Mary respectfully requests that this Court reverse the District Court's judgment and remand with instructions to enter judgment declaring that all rights in the Compositions covered by the terminated grants, including all associated royalties, reverted to the Heirs free and clear of Cher's rights under the MSA. Alternatively, the Court should direct entry of judgment declaring that the Publishers' Share reverted solely to the Heirs, free of any interest claimed by Cher, while the remaining share continues to be governed by the MSA.

The Court should also reverse the judgment concerning royalty administration and direct entry of judgment declaring that Mary, subject to the rights of the other Heirs, has sole discretion to appoint a worldwide royalty administrator – including herself or any other Heir, or an entity they own or control – and to authorize an administration fee of up to ten percent, without the additional restrictions imposed by the District Court.

Respectfully submitted,

Date: November 23, 2026

**DONAHUE FITZGERALD LLP**

*/s/ Daniel J. Schacht*
Daniel J. Schacht
Andrew S. MacKay
Hayley M. Lenahan
Padmini Cheruvu
Attorneys for Appellant MARY BONO

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, the following case is pending in the United States Court of Appeals for the Ninth Circuit and is related to this appeal:

*Cher v. Mary Bono*, No. 26-4919: This is an appeal from a judgment on attorneys' fees in the same matter in the United States District Court for the Central District of California, No. 2:21-CV-08157 JAK.

*/s/ Daniel J. Schacht*
Daniel J. Schacht

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-8085

I am the attorney or self-represented party.

**This brief contains** 9,735 **words,** including 13 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- [x] complies with the word limit of Cir. R. 32-1.
- [ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- [ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- [ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- [ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- [ ] complies with the length limit designated by court order dated ______.
- [ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Daniel Jochen Schacht **Date** November 23, 2026
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

## ADDENDUM OF STATUTORY PROVISIONS


| Statutory Provision | Page |
| --- | --- |
| 17 U.S.C. § 106 | ADD-2 |
| 17 U.S.C. § 203 | ADD-3 |
| 17 U.S.C. § 301 | ADD-6 |
| 17 U.S.C. § 302 | ADD-8 |
| 17 U.S.C. § 304 | ADD-10 |

**17 U.S.C. § 106: Exclusive rights in copyrighted works**

Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

**17 U.S.C. § 203: Termination of transfers and licenses granted by the author**

(a) Conditions for Termination.—In the case of any work other than a work made for hire, the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978, otherwise than by will, is subject to termination under the following conditions:

(1) In the case of a grant executed by one author, termination of the grant may be effected by that author or, if the author is dead, by the person or persons who, under clause (2) of this subsection, own and are entitled to exercise a total of more than one-half of that author's termination interest. In the case of a grant executed by two or more authors of a joint work, termination of the grant may be effected by a majority of the authors who executed it; if any of such authors is dead, the termination interest of any such author may be exercised as a unit by the person or persons who, under clause (2) of this subsection, own and are entitled to exercise a total of more than one-half of that author's interest.

(2) Where an author is dead, his or her termination interest is owned, and may be exercised, as follows:

(A) The widow or widower owns the author's entire termination interest unless there are any surviving children or grandchildren of the author, in which case the widow or widower owns one-half of the author's interest.

(B) The author's surviving children, and the surviving children of any dead child of the author, own the author's entire termination interest unless there is a widow or widower, in which case the ownership of one-half of the author's interest is divided among them.

(C) The rights of the author's children and grandchildren are in all cases divided among them and exercised on a per stirpes basis according to the number of such author's children represented; the share of the children of a dead child in a termination interest can be exercised only by the action of a majority of them.

(D) In the event that the author's widow or widower, children, and grandchildren are not living, the author's executor, administrator, personal representative, or trustee shall own the author's entire termination interest.

(3) Termination of the grant may be effected at any time during a period of five years beginning at the end of thirty-five years from the date of execution of the grant; or, if the grant covers the right of publication of the work, the period begins at the end of thirty-five years from the date of publication of the work under the grant or at the end of forty years from the date of execution of the grant, whichever term ends earlier.

(4) The termination shall be effected by serving an advance notice in writing, signed by the number and proportion of owners of termination interests required under clauses (1) and (2) of this subsection, or by their duly authorized agents, upon the grantee or the grantee's successor in title.

(A) The notice shall state the effective date of the termination, which shall fall within the five-year period specified by clause (3) of this subsection, and the notice shall be served not less than two or more than ten years before that date. A copy of the notice shall be recorded in the Copyright Office before the effective date of termination, as a condition to its taking effect.

(B) The notice shall comply, in form, content, and manner of service, with requirements that the Register of Copyrights shall prescribe by regulation.

(5) Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant.

(b) Effect of Termination.—Upon the effective date of termination, all rights under this title that were covered by the terminated grants revert to the author, authors, and other persons owning termination interests under clauses

(1) and (2) of subsection (a), including those owners who did not join in signing the notice of termination under clause (4) of subsection (a), but with the following limitations:

(1) A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

(2) The future rights that will revert upon termination of the grant become vested on the date the notice of termination has been served as provided by clause (4) of subsection (a). The rights vest in the author, authors, and other persons named in, and in the proportionate shares provided by, clauses (1) and (2) of subsection (a).

(3) Subject to the provisions of clause (4) of this subsection, a further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is signed by the same number and proportion of the owners, in whom the right has vested under clause (2) of this subsection, as are required to terminate the grant under clauses (1) and (2) of subsection (a). Such further grant or agreement is effective with respect to all of the persons in whom the right it covers has vested under clause (2) of this subsection, including those who did not join in signing it. If any person dies after rights under a terminated grant have vested in him or her, that person's legal representatives, legatees, or heirs at law represent him or her for purposes of this clause.

(4) A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination. As an exception, however, an agreement for such a further grant may be made between the persons provided by clause (3) of this subsection and the original grantee or such grantee's successor in title, after the notice of termination has been served as provided by clause (4) of subsection (a).

(5) Termination of a grant under this section affects only those rights covered by the grants that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws.

(6) Unless and until termination is effected under this section, the grant, if it does not provide otherwise, continues in effect for the term of copyright provided by this title.

**17 U.S.C. § 301: Preemption with respect to other laws**

(a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

(b) Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to—

(1) subject matter that does not come within the subject matter of copyright as specified by sections 102 and 103, including works of authorship not fixed in any tangible medium of expression; or

(2) any cause of action arising from undertakings commenced before January 1, 1978;

(3) activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106; or

(4) State and local landmarks, historic preservation, zoning, or building codes, relating to architectural works protected under section 102(a)(8).

(c) Notwithstanding the provisions of section 303, and in accordance with chapter 14, no sound recording fixed before February 15, 1972, shall be subject to copyright under this title. With respect to sound recordings fixed before February 15, 1972, the preemptive provisions of subsection (a) shall apply to activities that are commenced on and after the date of enactment of the Classics Protection and Access Act. Nothing in this subsection may be construed to affirm or negate the preemption of rights and remedies pertaining to any cause of action arising from the nonsubscription broadcast transmission of sound recordings under the common law or statutes of any State for activities that do not qualify as covered activities under chapter 14 undertaken

during the period between the date of enactment of the Classics Protection and Access Act and the date on which the term of prohibition on unauthorized acts under section 1401(a)(2) expires for such sound recordings. Any potential preemption of rights and remedies related to such activities undertaken during that period shall apply in all respects as it did the day before the date of enactment of the Classics Protection and Access Act.

(d) Nothing in this title annuls or limits any rights or remedies under any other Federal statute.

(e) The scope of Federal preemption under this section is not affected by the adherence of the United States to the Berne Convention or the satisfaction of obligations of the United States thereunder.

(f)

(1) On or after the effective date set forth in section 610(a) of the Visual Artists Rights Act of 1990, all legal or equitable rights that are equivalent to any of the rights conferred by section 106A with respect to works of visual art to which the rights conferred by section 106A apply are governed exclusively by section 106A and section 113(d) and the provisions of this title relating to such sections. Thereafter, no person is entitled to any such right or equivalent right in any work of visual art under the common law or statutes of any State[3].

(2) Nothing in paragraph (1) annuls or limits any rights or remedies under the common law or statutes of any State with respect to—

(A) any cause of action from undertakings commenced before the effective date set forth in section 610(a) of the Visual Artists Rights Act of 1990;

(B) activities violating legal or equitable rights that are not equivalent to any of the rights conferred by section 106A with respect to works of visual art; or

(C) activities violating legal or equitable rights which extend beyond the life of the author.

**17 U.S.C. § 302: Duration of copyright: Works created on or after January 1, 1978**

(a) In General.—Copyright in a work created on or after January 1, 1978, subsists from its creation and, except as provided by the following subsections, endures for a term consisting of the life of the author and 70 years after the author's death.

(b) Joint Works.—In the case of a joint work prepared by two or more authors who did not work for hire, the copyright endures for a term consisting of the life of the last surviving author and 70 years after such last surviving author's death.

(c) Anonymous Works, Pseudonymous Works, and Works Made for Hire.—In the case of an anonymous work, a pseudonymous work, or a work made for hire, the copyright endures for a term of 95 years from the year of its first publication, or a term of 120 years from the year of its creation, whichever expires first. If, before the end of such term, the identity of one or more of the authors of an anonymous or pseudonymous work is revealed in the records of a registration made for that work under subsections (a) or (d) of section 408, or in the records provided by this subsection, the copyright in the work endures for the term specified by subsection (a) or (b), based on the life of the author or authors whose identity has been revealed. Any person having an interest in the copyright in an anonymous or pseudonymous work may at any time record, in records to be maintained by the Copyright Office for that purpose, a statement identifying one or more authors of the work; the statement shall also identify the person filing it, the nature of that person's interest, the source of the information recorded, and the particular work affected, and shall comply in form and content with requirements that the Register of Copyrights shall prescribe by regulation.

(d) Records Relating to Death of Authors.—Any person having an interest in a copyright may at any time record in the Copyright Office a statement of the date of death of the author of the copyrighted work, or a statement that the author is still living on a particular date. The statement shall identify the person filing it, the nature of that person's interest, and the source of the information recorded, and shall comply in form and content with requirements that the Register of Copyrights shall prescribe by regulation. The Register shall maintain current

records of information relating to the death of authors of copyrighted works, based on such recorded statements and, to the extent the Register considers practicable, on data contained in any of the records of the Copyright Office or in other reference sources.

(e) Presumption as to Author's Death.—After a period of 95 years from the year of first publication of a work, or a period of 120 years from the year of its creation, whichever expires first, any person who obtains from the Copyright Office a certified report that the records provided by subsection (d) disclose nothing to indicate that the author of the work is living, or died less than 70 years before, is entitled to the benefit of a presumption that the author has been dead for at least 70 years. Reliance in good faith upon this presumption shall be a complete defense to any action for infringement under this title.

**17 U.S.C. § 304: Duration of copyright: Subsisting copyrights**

(a) Copyrights in Their First Term on January 1, 1978.—

(1)

(A) Any copyright, in the first term of which is subsisting on January 1, 1978, shall endure for 28 years from the date it was originally secured.

(B) In the case of—

(i) any posthumous work or of any periodical, cyclopedic, or other composite work upon which the copyright was originally secured by the proprietor thereof, or

(ii) any work copyrighted by a corporate body (otherwise than as assignee or licensee of the individual author) or by an employer for whom such work is made for hire, the proprietor of such copyright shall be entitled to a renewal and extension of the copyright in such work for the further term of 67 years.

(C) In the case of any other copyrighted work, including a contribution by an individual author to a periodical or to a cyclopedic or other composite work—

(i) the author of such work, if the author is still living,

(ii) the widow, widower, or children of the author, if the author is not living,

(iii) the author's executors, if such author, widow, widower, or children are not living, or

(iv) the author's next of kin, in the absence of a will of the author, shall be entitled to a renewal and extension of the copyright in such work for a further term of 67 years.

(2)

(A) At the expiration of the original term of copyright in a work specified in paragraph (1)(B) of this subsection, the copyright

shall endure for a renewed and extended further term of 67 years, which—

(i) if an application to register a claim to such further term has been made to the Copyright Office within 1 year before the expiration of the original term of copyright, and the claim is registered, shall vest, upon the beginning of such further term, in the proprietor of the copyright who is entitled to claim the renewal of copyright at the time the application is made; or

(ii) if no such application is made or the claim pursuant to such application is not registered, shall vest, upon the beginning of such further term, in the person or entity that was the proprietor of the copyright as of the last day of the original term of copyright.

(B) At the expiration of the original term of copyright in a work specified in paragraph (1)(C) of this subsection, the copyright shall endure for a renewed and extended further term of 67 years, which—

(i) if an application to register a claim to such further term has been made to the Copyright Office within 1 year before the expiration of the original term of copyright, and the claim is registered, shall vest, upon the beginning of such further term, in any person who is entitled under paragraph (1)(C) to the renewal and extension of the copyright at the time the application is made; or

(ii) if no such application is made or the claim pursuant to such application is not registered, shall vest, upon the beginning of such further term, in any person entitled under paragraph (1)(C), as of the last day of the original term of copyright, to the renewal and extension of the copyright.

(3)

(A) An application to register a claim to the renewed and extended term of copyright in a work may be made to the Copyright Office—

(i) within 1 year before the expiration of the original term of copyright by any person entitled under paragraph (1)(B) or (C) to such further term of 67 years; and

(ii) at any time during the renewed and extended term by any person in whom such further term vested, under paragraph (2)(A) or (B), or by any successor or assign of such person, if the application is made in the name of such person.

(B) Such an application is not a condition of the renewal and extension of the copyright in a work for a further term of 67 years.

(4)

(A) If an application to register a claim to the renewed and extended term of copyright in a work is not made within 1 year before the expiration of the original term of copyright in a work, or if the claim pursuant to such application is not registered, then a derivative work prepared under authority of a grant of a transfer or license of the copyright that is made before the expiration of the original term of copyright may continue to be used under the terms of the grant during the renewed and extended term of copyright without infringing the copyright, except that such use does not extend to the preparation during such renewed and extended term of other derivative works based upon the copyrighted work covered by such grant.

(B) If an application to register a claim to the renewed and extended term of copyright in a work is made within 1 year before its expiration, and the claim is registered, the certificate of such registration shall constitute prima facie evidence as to the validity of the copyright during its renewed and extended term and of the facts stated in the certificate. The evidentiary weight to be accorded the certificates of a registration of a renewed and extended term of copyright made after the end of that 1-year period shall be within the discretion of the court.

(b) Copyrights in Their Renewal Term at the Time of the Effective Date of the Sonny Bono Copyright Term Extension Act[7]—Any copyright still in its renewal term at the time that the Sonny Bono Copyright Term Extension Act becomes effective shall have a copyright term of 95 years from the date copyright was originally secured.[8]

(c) Termination of Transfers and Licenses Covering Extended Renewal Term.—In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a copyright in a work made for hire, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by any of the persons designated by subsection (a)(1)(C) of this section, otherwise than by will, is subject to termination under the following conditions:

(1) In the case of a grant executed by a person or persons other than the author, termination of the grant may be effected by the surviving person or persons who executed it. In the case of a grant executed by one or more of the authors of the work, termination of the grant may be effected, to the extent of a particular author's share in the ownership of the renewal copyright, by the author who executed it or, if such author is dead, by the person or persons who, under clause (2) of this subsection, own and are entitled to exercise a total of more than one-half of that author's termination interest.

(2) Where an author is dead, his or her termination interest is owned, and may be exercised, as follows:

(A) The widow or widower owns the author's entire termination interest unless there are any surviving children or grandchildren of the author, in which case the widow or widower owns one-half of the author's interest.

(B) The author's surviving children, and the surviving children of any dead child of the author, own the author's entire termination interest unless there is a widow or widower, in which case the ownership of one-half of the author's interest is divided among them.

(C) The rights of the author's children and grandchildren are in all cases divided among them and exercised on a per stirpes basis according to the number of such author's children represented; the share of the children of a dead child in a termination interest can be exercised only by the action of a majority of them.

(D) In the event that the author's widow or widower, children, and grandchildren are not living, the author's executor, administrator, personal representative, or trustee shall own the author's entire termination interest.

(3) Termination of the grant may be effected at any time during a period of five years beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later.

(4) The termination shall be effected by serving an advance notice in writing upon the grantee or the grantee's successor in title. In the case of a grant executed by a person or persons other than the author, the notice shall be signed by all of those entitled to terminate the grant under clause (1) of this subsection, or by their duly authorized agents. In the case of a grant executed by one or more of the authors of the work, the notice as to any one author's share shall be signed by that author or his or her duly authorized agent or, if that author is dead, by the number and proportion of the owners of his or her termination interest required under clauses (1) and (2) of this subsection, or by their duly authorized agents.

(A) The notice shall state the effective date of the termination, which shall fall within the five-year period specified by clause (3) of this subsection, or, in the case of a termination under subsection (d), within the five-year period specified by subsection (d)(2), and the notice shall be served not less than two or more than ten years before that date. A copy of the notice shall be recorded in the Copyright Office before the effective date of termination, as a condition to its taking effect.

(B) The notice shall comply, in form, content, and manner of service, with requirements that the Register of Copyrights shall prescribe by regulation.

(5) Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant.

(6) In the case of a grant executed by a person or persons other than the author, all rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to all of those entitled to terminate the grant under clause (1) of this subsection. In the case of a grant executed by one or more of the authors of the work, all of a particular author's rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to that author or, if that author is dead, to the persons owning his or her termination interest under clause (2) of this subsection, including those owners who did not join in signing the notice of termination under clause (4) of this subsection. In all cases the reversion of rights is subject to the following limitations:

> (A) A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.
>
> (B) The future rights that will revert upon termination of the grant become vested on the date the notice of termination has been served as provided by clause (4) of this subsection.
>
> (C) Where the author's rights revert to two or more persons under clause

(2) of this subsection, they shall vest in those persons in the proportionate shares provided by that clause. In such a case, and subject to the provisions of subclause (D) of this clause, a further grant, or agreement to make a further grant, of a particular author's share with respect to any right covered by a terminated grant is valid only if it is signed by the same number and proportion of the owners, in whom the right has vested under this clause, as are required to terminate the grant under clause (2) of this subsection. Such further grant or agreement is effective with respect to all of

the persons in whom the right it covers has vested under this subclause, including those who did not join in signing it. If any person dies after rights under a terminated grant have vested in him or her, that person's legal representatives, legatees, or heirs at law represent him or her for purposes of this subclause.

(D) A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination. As an exception, however, an agreement for such a further grant may be made between the author or any of the persons provided by the first sentence of clause (6) of this subsection, or between the persons provided by subclause (C) of this clause, and the original grantee or such grantee's successor in title, after the notice of termination has been served as provided by clause (4) of this subsection.

(E) Termination of a grant under this subsection affects only those rights covered by the grant that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws.

(F) Unless and until termination is effected under this subsection, the grant, if it does not provide otherwise, continues in effect for the remainder of the extended renewal term.

(d) Termination Rights Provided in Subsection (c) Which Have Expired on or before the Effective Date of the Sonny Bono Copyright Term Extension Act.—In the case of any copyright other than a work made for hire, subsisting in its renewal term on the effective date of the Sonny Bono Copyright Term Extension Act[9] for which the termination right provided in subsection (c) has expired by such date, where the author or owner of the termination right has not previously exercised such termination right, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by any of the persons designated in subsection (a)(1)(C) of this section, other than by will, is subject to termination under the following conditions:

(1) The conditions specified in subsections (c) (1), (2), (4), (5), and (6) of this section apply to terminations of the last 20 years of

copyright term as provided by the amendments made by the Sonny Bono Copyright Term Extension Act.

(2) Termination of the grant may be effected at any time during a period of 5 years beginning at the end of 75 years from the date copyright was originally secured.